IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| LAURA PITTMAN, <br>     Plaintiff, <br><br> v. <br><br> COMMISSIONER OF <br> SOCIAL SECURITY, <br>     Defendant. | Civil Action No. 4:16-cv-18 <br><br> REPORT AND RECOMMENDATION <br><br> By:   Joel C. Hoppe <br> United States Magistrate Judge |

Plaintiff Laura Pittman asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence. Therefore, I recommend that the Court **GRANT** Pittman's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 18, and **REMAND** this case for further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62

(1983); 20 C.F.R. § 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

This is not Pittman's first attempt to obtain social security benefits. She previously filed an application for SSI on August 25, 2009. Administrative Record ("R.") 20, ECF No. 9. She alleged onset of disability as October 1, 1999. R. 107. After Disability Determination Services ("DDS"), the state agency, denied her application initially and on reconsideration, she appeared at a hearing before ALJ Charles Boyer, who denied her claim in a written decision dated November 23, 2010, R. 107–17. He found that Pittman had two severe impairments: fibromyalgia and migraine headaches. R. 109. ALJ Boyer determined that Pittman had the residual functional capacity ("RFC")[1] to perform the full range of light work.[2] Because Pittman had never been employed, she had no past relevant work, but ALJ Boyer concluded that a finding of not disabled was directed by the Vocational Rule 202.20 because of her RFC. R. 116–17. Pittman appealed this decision to the Appeals Council, which denied her request for review on October 28, 2011. R. 20. Because she did not appeal this determination any further, ALJ Boyer's opinion became the final decision of the Commissioner through November 23, 2010. *Id.*

On April 9, 2012, Pittman reapplied for SSI and alleged the same onset date of October 1, 1999. *Id.* Again, DDS denied her claim initially, R. 128–37, and on reconsideration, R. 139–54. ALJ Mary Peltzer presided over an administrative hearing on October 15, 2014, at which Pittman

---

[1] A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

appeared with counsel and testified about her impairments and the attendant functional limitations she experienced. R. 80–103. A vocational expert ("VE") also testified about Pittman's ability to do work available in the national and local economies. R. 97–102.

ALJ Peltzer issued a written decision denying Pittman's claim on December 16, 2014. R. 20–36. She found that Pittman had severe impairments of fibromyalgia, chronic fatigue syndrome, migraine headaches, asthma, and generalized anxiety disorder. R. 22. In conducting the step-three analysis, ALJ Peltzer found that Pittman had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. 23–24. As to Pittman's RFC, ALJ Peltzer determined that she could perform light work, except that she could have only occasional exposure to extreme heat, extreme cold, humidity, and respiratory irritants such as dust and fumes. R. 25. Additionally, Pittman's work must be restricted to a moderate (level 3) noise environment, and she could perform simple routine tasks that generally involve things instead of people, no contact with the general public, occasional contact with coworkers, and no tandem work assignments. *Id.* In formulating the RFC, ALJ Peltzer noted that because a prior decision of the Commissioner found Pittman not disabled through November 23, 2010, the relevant period under consideration ranged from November 24, 2010, through the date of the current opinion. R. 26. Pittman still had no past relevant work. R. 35. Based on the RFC and the testimony of the VE, however, ALJ Peltzer determined that Pittman could perform other light jobs that existed in significant numbers in the national and local economies, including office helper, order filler, and marker/pricer; thus, she found that Pittman was not disabled. R. 35–36. The Appeals Council denied Pittman's request for review, R. 1–3, and this appeal followed.

III. Discussion

Pittman presents three arguments on appeal. First, Pittman contends that the ALJ erred by failing to develop the record because she based her decision on a record that was, by her own estimation, incomplete by virtue of the illegibility of many handwritten treatment notes. Pl.'s Br. 7–10, ECF No. 14. Second, she asserts that the ALJ erred in weighing the opinion evidence, particularly that of her primary care physician, F.B. Mitchell, M.D., and the mental health consultative examiner, Christopher Cousins, Ph.D. *Id.* at 10–14. Third, she claims that the ALJ failed to account for her moderate limitation in maintaining concentration, persistence, or pace in the hypothetical to the VE and the concomitant RFC finding, in violation of the of the Fourth Circuit's opinion in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). *Id.* at 14–15.

A.   *Relevant Facts, Testimony, and Opinion Evidence*

Pittman was diagnosed with fibromyalgia in 1998, R. 452, 457, and chronic fatigue syndrome by 2001, R. 319. A psychological evaluation conducted in February 2001 noted that her doctor recommended she be exempted from standardized testing to avoid stressful situations that may be harmful to her well-being, and it was observed that her greatest weakness was that she tired quickly when working on assignments that required time. R. 319–20; *see also* R. 452. More recently, she reported—often multiple times per month throughout the relevant period— that she experienced migraines and cluster headaches frequently lasting days at a time. *See* R. 360, 376–79, 383, 565–80, 594–607, 616–24, 633–34. Although the ALJ is correct that much of these treatment notes are illegible, one can sufficiently discern from Dr. Mitchell's notes that Pittman regularly complained of headaches and was treated with various medications.[3] *Id.* For example, she was prescribed Ultram, R. 565, 567, 572, 576, 580, 598–99, 605–06, 618, 622, 633–34, tramadol, R. 378, Demerol, R. 567, 607, Imitrex, R. 594, 619, Fiorinal, R. 598, and

---

[3] The ALJ did not acknowledge many of these visits in her recitation of the evidence, *see* R. 26–29, even though portions of the notes are legible.

Topamax, R. 601, at different times. Dr. Mitchell noted on occasion, however, that her medication either did not alleviate these headaches or was not tolerated well. R. 594, 596, 623. He also observed signs such as vomiting, blurred vision, and shaking. R. 576, 597, 603, 623. Additionally, although Pittman did not treat with a mental health specialist–other than receiving counseling in the fourth grade after the death of her uncle, R. 559–the record is replete with reports of panic attacks and a past medical history of anxiety, *see* R. 324, 379–82, 500, 504, 547–48, 582, 584, 596, 612, 620.

Pittman testified at the administrative hearing that she experienced pain on a daily basis and had very high anxiety. R. 84–85. She had not seen any specialists because it would be too expensive, and she treated at the Halifax Clinic with Dr. Mitchell for most of her issues. R. 85. She also had trouble sleeping, which caused her to be exhausted most of the time. R. 85–86. She lived with her parents and helped around the house when she could, but her parents did most of the chores. R. 83, 92–93. She had a dog, whom she referred to as a "therapy" dog. R. 93–94. It provided her comfort when she felt ill, and her mother took care of the dog. *Id.* She spent most of her time with the dog and with her goddaughter, who would visit on occasion. 94–95. Being around strangers and large groups of people (i.e., more than five) triggered her panic attacks. R. 95. Additionally, she rarely ventured outside of South Boston because to do so gave her tremendous anxiety. R. 83–84.

In a pain questionnaire completed on June 20, 2012, Pittman explained that she would black out sometimes if she stood in one spot too long. R. 254. Additionally, Ultram, which she took as needed, caused her to be more tired. *Id.* In a fatigue questionnaire completed on September 24, 2012, she explained that she had no social life as a result of her health and fatigue. R. 264. Doing anything, even taking a shower, caused her to be more tired. *Id.* Her memory was

6

bad, and she frequently forgot things. *Id.* She also experienced "memory fog," which caused her mind to go blank and wander and kept her from focusing. *Id.*

Her mother completed a third-party function report on January 8, 2013. R. 267–77. She explained that Pittman needed reminders to take care of her grooming, go to her doctor's appointments, refill her medications, and, on occasion, take her medicine. R. 270, 273. Pittman did not spend time with others. R. 273. She also observed Pittman's difficulties with her memory, understanding, concentration, ability to follow instructions, and ability to complete tasks. *Id.* She noted that Pittman's mind got groggy, which caused her to forget things. R. 274. Pittman could finish a conversation, but not chores, reading, or a movie. *Id.* Pittman followed spoken instructions "half and half" and did not handle stress or changes in routine well. R. 274–75.

On August 28, 2012, as part of the initial review of Pittman's claim, DDS reviewing expert Leslie Montgomery, Ph.D., A.B.P.P., found Pittman's anxiety disorders to be non-severe. R. 133. She determined that Pittman had mild restrictions in her activities of daily living, social functioning, and maintaining concentration, persistence, or pace. *Id.* She did not, however, conduct a full mental RFC evaluation. On reconsideration in an opinion dated April 11, 2013, David Niemeier, Ph.D., reassessed Pittman's mental functioning and also determined that her anxiety disorders were non-severe. R. 147. He found mild restrictions in her activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence, or pace. *Id.* He also found she was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others

without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 150–51. Nonetheless, Dr. Niemeier concluded that Pittman should be able to complete simple, routine tasks in an environment with limited interpersonal interaction. R. 151.

On March 12, 2013, Dr. Cousins completed a mental health consultative examination. R. 557–62. He observed normal affect, but anxious mood. R. 557. He noted that Pittman spoke with a nervous tremble on occasion, had significant nervous psychomotor agitation, and her legs shook in a nervous manner. *Id.* Despite remarking that there were no psychiatric records available for him to examine, Dr. Cousins explained that the available medical records indicated that Pittman experienced significant anxiety. R. 559. At that time, Pittman took Zoloft twice a day, Atarax as needed, metoprolol once a day, Soma (carisoprodol) four times a day, tramadol four times a day, promethazine one to two tablets every four to six hours, and Q-Var every day. *Id.* Dr. Cousins found that her immediate memory appeared to be good, and her remote memory appeared to be fair to good. R. 560. He measured her ability to concentrate by having her spell the word "world" backwards, which she accomplished successfully. *Id.* Additionally, her calculation ability, abstract thinking ability, and judgment and common sense reasoning ability all appeared to be good, but her general fund of information appeared to be poor. *Id.* Dr. Cousins diagnosed panic disorder with agoraphobia and assessed a Global Assessment of Functioning ("GAF") score of 55.[4] R. 561. He additionally explained that she appeared capable of performing

---

[4] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most

simple and repetitive tasks as well as some detailed and complex tasks. *Id.* She would not, however, be able to maintain regular attendance in the workplace, perform work activities on a consistent basis, or complete a normal workday or workweek without interruption because of the frequency and severity of her panic attacks. *Id.* She also would not be able to successfully interact with coworkers or the general public. R. 561–62.

B.  *ALJ Peltzer's Decision*

As noted above, ALJ Peltzer found at step three that Pittman had moderate difficulties in maintaining concentration, persistence, or pace. R. 24. ALJ Peltzer's explanation, in full, states that

> [t]he claimant's mother alleged that the claimant needed reminders to manage her personal care needs and to take medication[. R. 270]. The claimant's mother said the claimant could count change and watched television at times[. R. 272]. She said the claimant finished conversations that she started, but otherwise did not finish other tasks. She said the claimant's ability to follow spoken instructions was "half and half" and that she did not handle stress or changes in routine well[. R. 274–75].

R. 24. Then, the ALJ found that Pittman's RFC allowed her to "perform simple routine tasks that generally involve things instead of people, with no contact with the general public and occasional contact with coworkers, with no tandem work assignments." R. 25. In explaining this RFC, ALJ Peltzer recited some of the legible medical records, analyzed Pittman's subjective statements about her pain and symptoms, and evaluated the opinion evidence. R. 25–35. In

---

functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33. The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation–For Clinicians*, Aug. 1, 2013, http://www.dsm5.org/Documents/FAQ% 20for%20 Clinicians%208-1-13.pdf.

A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

particular, ALJ Peltzer explained that she gave greater weight to the reconsideration opinion of Dr. Niemeier that Pittman could do simple routine tasks with limited interpersonal interaction with the public and coworkers. R. 31. She stated that this assessment was more consistent with the statements from Pittman and her mother regarding Pittman's difficulties being around crowds and strangers, as well as Pittman's claims that she did not go anywhere on a regular basis. R. 31–32. Overall, ALJ Peltzer stated that she afforded more weight to this opinion than to Dr. Montgomery's initial opinion because the reconsideration opinion was balanced and consistent with the longitudinal evidence of record as a whole. R. 32.

C.   *Analysis*

Pittman's objection to the ALJ's findings as to concentration, persistence, or pace invokes the Fourth Circuit's opinion in *Mascio*, in which the court considered whether the ALJ erred by adopting as the RFC a hypothetical posed to the VE that did not include any mental limitations other than a restriction to unskilled work, despite having found at step three that the claimant had moderate difficulties in maintaining concentration, persistence, or pace. 780 F.3d at 637–38. The court found that the limitations included in the RFC were narrower than those identified by the ALJ at step three. It reasoned that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical to simple, routine tasks or unskilled work'" because "the ability to perform simple tasks differs from the ability to stay on task." *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). Finding that the ALJ failed to give any explanation of why his step-three finding did not translate into a work-related limitation in the RFC, the court determined that remand was necessary. *Id.*

By finding moderate difficulties in maintaining concentration, persistence, or pace at step three and limiting Pittman to simple, routine tasks, ALJ Peltzer committed the exact error identified in *Mascio*. She compounded this error by assigning greater weight to the DDS reconsideration opinion, which identified numerous moderate limitations in functioning related to concentration, persistence, or pace, yet nonetheless concluded that Pittman could do simple, routine tasks with no other accommodations for deficiencies in this area of functioning. This outcome is deficient in light of *Mascio*. To be sure, the ALJ is not bound in every instance to include additional limitations in the RFC after making such a step-three finding, but should the ALJ choose to limit a claimant with moderate difficulties in maintaining concentration, persistence, or pace to simple, routine tasks or unskilled work, she must provide an adequate explanation. *Id.*; *see also Perdue v. Colvin*, No. 7:14cv173, 2015 WL 5771813, at *6 (W.D. Va. Sept. 30, 2015) ("[W]hen the Law Judge believes that a particular claimant's impairments in concentration, persistence, and pace do not affect the claimant's capacity for simple, routine, or unskilled work, it seems only reasonable that the Law Judge should explain this finding, in relation to the medical record."). Such an explanation is lacking in ALJ Peltzer's opinion. As the Fourth Circuit stated, then, "because the ALJ here gave no explanation, a remand is in order." *Mascio*, 780 F.3d at 638.

The analysis does not end here, however. In this case, unlike in *Mascio*, the ALJ provided for other limitations in her RFC beyond a restriction to simple, unskilled work. Namely, she found that Pittman should be limited to work that involves things instead of people, with no contact with the general public and occasional contact with coworkers, but no tandem work assignments. R. 25. Nevertheless, ALJ Peltzer does not explain whether these various restrictions were included as a means to address Pittman's limitations in concentration, persistence, or pace,

11

or whether they related to some other area of functioning, such as her moderate difficulties in maintaining social functioning also found at step three. As *Mascio* noted, the ability to perform skilled or detailed work is distinct from the ability to stay on task. 780 F.3d at 638. A claimant who is capable of understanding and performing simple and unskilled work activities may not be able to maintain sufficient concentration to do those activities consistently over a regular workday or workweek. Similarly, a restriction that limits the level of social interaction that a claimant experiences does not necessarily alleviate difficulties she may have with focusing, staying on task, or maintaining a consistent pace. It was therefore necessary for the ALJ to explain the scope of the limitations she identified at step three. Without an explanation for this finding, the Court cannot conduct meaningful review of the ALJ's decision, and thus remand is warranted.

In defending the ALJ's decision, the Commissioner argues that Pittman's challenge is meritless because she did not "support her argument with a medical opinion stating that [she] would be off-task." Def.'s Br. 14, ECF No. 19. The Commissioner cites no support for this assertion, and it is legally and factually inaccurate. Dr. Niemeier opined that Pittman had a moderate limitation in maintaining concentration, persistence, or pace, which the Fourth Circuit in *Mascio* determined showed a diminished ability to stay on task. The Commissioner also implicitly argues that the medical record shows that the limitations in the RFC sufficiently accounted for the minimal findings relevant to Pittman's mental impairments. *Id.* at 15. The Commissioner is correct to observe that the treatment record does not extensively document limitations in Pittman's ability to pay attention and concentrate. It is not enough, however, that the ALJ's RFC finding comports with many of the treatment notes; rather, *Mascio* also demands that the ALJ resolve conflicting evidence and provide a coherent, consistent analysis that enables

the reviewing court to ascertain the reasons for her finding. *See* 780 F.3d at 637–38. As explained above, this was not present here.

Overall, ALJ Peltzer seemed to credit Pittman's testimony and her mother's observations at step three by finding that she had a moderate limitation in maintaining concentration, persistence, or pace. She then found, without addressing Pittman's ability to stay on task, that Pittman had the RFC to perform simple, routine work. She also did not explicitly relate the additional limitations identified in the RFC to Pittman's difficulties in concentration, persistence, or pace, as opposed to Pittman's difficulties in maintaining social functioning. The ALJ's opinion must "build an accurate and logical bridge from the evidence to [her] conclusion, *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), and here, ALJ Peltzer's discordant conclusions at step three and the RFC require remand, *see Mascio*, 780 F.3d at 638; *see also Claiborne v. Comm'r*, No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) (stating that the ALJ's findings at step three should represent a well-reasoned consideration of the evidence and that this is "not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step").

As to Pittman's other objections, on remand, the ALJ should fully consider the medical evidence of record and consider whether to obtain a medical source statement from Dr. Mitchell regarding his treatment notes. She also should fully explain her assessment of the medical opinions in the record, taking care to evaluate Pittman's impairments in light of the relevant standards. Specifically, the ALJ's analysis of Pittman's fibromyalgia should be undertaken in accordance with SSR 12-2p, 2012 WL 3104869 (July 25, 2012), and her migraine headaches should be evaluated under the proper standard, *see Sidbury v. Astrue*, No. 7:08-CV-168-FL, 2009

13

WL 3029741, at *6 (E.D.N.C. Sept. 22, 2009) ("Consequently, signs and symptoms, such as nausea, vomiting, eye pain, aura, photophobia[,] and phonophobia, are often the only means to prove the existence of migraine headaches and should be viewed as objective evidence.").

IV. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** Pittman's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 18, **REMAND** this case for further administrative proceedings, and **DISMISS** the case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 15, 2017

Joel C. Hoppe
United States Magistrate Judge